Jack O. CHERTKOF and Ethel Posnick, Executors of the Estate of Annie Chertkof, Appellants,

v.

UNITED STATES of America, Appellee.

Jack O. CHERTKOF, Trustee of the David W. Chertkof Trust, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 81–1358, 81–1359.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1981.

Decided April 1, 1982.

Richard E. Levine, Baltimore, Md. (Theodore W. Hirsh, Miles & Stockbridge, Baltimore, Md., on brief), for appellants.

Jo-Ann Horn, Tax Div., Dept. of Justice, Washington, D. C. (J. Frederick Motz, U. S. Atty., Baltimore, Md., John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

On September 17, 1968, David W. Chertkof died. On September 13, 1969, Annie Chertkof's life came to a close. There were transfers of certain shares of stock owned by the decedents to the estate of Annie and into a trust created by David.[1] New bases for the securities were consequently established for the purposes of determining gain or loss for federal income tax purposes.[2]

Estate tax returns were filed claiming values for the securities as fixed by the executors. The government did not accept the estate tax valuations and, on November 14, 1972, a Notice of Deficiency was issued to David's estate, and on November 8, 1973 such a Notice went to Annie's estate. In due course, the matter not having been settled administratively, cases were commenced in the United States Tax Court by the Chertkof fiduciaries. On November 1, 1974 (in Annie's estate) and November 4, 1974 (in David's estate),[3] as a result of negotiated settlements between the parties, the Tax Court entered decisions fixing values for the securities greater than those

1. The trust was created and the shares of stock transferred to it some seven months prior to David's death. As the trust was a revocable one, with the settlor retaining the right to receive all income, however, its assets were treated as though, for purposes of establishing basis, they had been owned by David at the time of his death. 26 U.S.C. § 1014(b)(2).

2. 26 U.S.C. § 1014: "... [T]he basis of property in the hands of a person acquiring the property from a decedent ... shall ... be the fair market value of the property at the date of the decedent's death...."
   We have no occasion to complicate things by references to the statutory provisions relating to the alternate valuation date, which plays no role in the decision we must make.

3. Hereafter, for simplicity's sake, we will refer collectively to the Tax Court decisions as having a common date of November 4, 1974.

originally employed when the estate tax returns had been filed.[4] The resulting increases in estate tax liabilities ($284,144.47 in David's estate, $90,338.68 in Annie's estate) are not in issue here.

However, during the fiscal year ended February 28, 1971, sales and liquidating distributions on some of the securities in the David Chertkof trust and liquidating distributions on shares held in the Annie Chertkof estate had occurred. In computing the extent of aggregate gains thereby recognized, in income tax returns due and filed on June 15, 1971, i.e. well before the estate tax deficiency claim surfaced, the trustees and executors used the values contained in the estate tax returns. Consequently, on the basis of the higher values ultimately fixed for estate tax purposes by the Tax Court orders of November 4, 1974, the extent of gains for income tax purposes had been overstated (and the extent of a loss had been correspondingly understated). However, attempts to secure refunds were rebuffed on the ground that the limitations period of three years,[5] accounting from June 15, 1971, had already run.[6] That limitations had run was undoubtedly the case unless the special mitigation provisions of 26 U.S.C. §§ 1311–1314 applied.[7] Claims for refund of income taxes paid for the fiscal years ended February 28, 1971 were filed on April 15, 1975, and suits were instituted on March 30, 1977 by the David Chertkof trust and the Annie Chertkof estate in the United States District Court for the District of Maryland seeking refund of the income tax overpayments.[8] Although

---

**4.** It was also agreed, contemporaneously with, but collateral to, the settlements, that the adjusted bases resulting from the parties' compromise would be employed in thereafter calculating gains and losses for income tax purposes. The Chertkof fiduciaries have not argued that the agreement extended to determinations of gains and losses in income tax returns previously filed.

**5.** 26 U.S.C. § 6511.

**6.** It is to be noted that, since the three years expired on June 15, 1974, a timely refund claim would have had to have been filed nearly five months before the determination by the Tax Court took place which created the basis for a recovery.

**7.** 26 U.S.C. § 1314(b) would, if applicable, extend the limitations period to November 1, or November 4, 1975, respectively.

**8.** 26 U.S.C. § 1311(a) states a general rule:

If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, . . . then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

Section 1311(b)(1) requires that the position maintained by the Secretary of the Treasury or his delegate, on the one hand, or the taxpayer with respect to whom the determination has been made, on the other, be "inconsistent with the erroneous inclusion, exclusion, omission, allowance, disallowance, recognition or nonrecognition as the case may be."

Certain circumstances, according to § 1312, must exist to permit the corrective steps contemplated by § 1311(a). The one under which the taxpayers have sought to qualify is § 1312(7):

Basis of property after erroneous treatment of a prior transaction.

(A) General rule. The determination determines the basis of property, and in respect of any transaction on which such basis depends, or in respect of any transaction which was erroneously treated as affecting such basis, there occurred, with respect to a taxpayer described in subparagraph (B) of this paragraph, any of the errors described in subparagraph (C) of this paragraph.

(B) Taxpayers with respect to whom the erroneous treatment occurred. The taxpayer with respect to whom the erroneous treatment occurred must be—

(i) the taxpayer with respect to whom the determination is made,

(ii) a taxpayer who acquired title to the property in the transaction and from whom, mediately or immediately, the taxpayer with respect to whom the determination is made derived title,

. . . .

(C) Prior erroneous treatment. With respect to a taxpayer described in subparagraph (B) of this paragraph—

(i) there was an erroneous inclusion in, or omission from, gross income, . . . .

A determination is defined in § 1313(a). In § 1313(a)(1) a determination is defined as "a decision by the Tax Court." In terms of language alone, there certainly were Tax Court decisions.

Finally we come to § 1314 dealing with the amount and method of the adjustment. First

several of the taxpayers' contentions prevailed, they were ultimately unsuccessful in the district court. *Chertkof v. United States*, 81–1 U.S.T.C. ¶ 9326 (1981).

In resisting the refund claims, the government's principal position is that the mitigation statutes are restricted in their application to any inequities resulting where income is overstated or understated in conjunction with a determination made in another connection solely and exclusively *for income tax purposes.* Here the government would emphasize that, although the refunds which the taxpayers seek are income tax refunds, the upward redetermination of values made by the Tax Court in its orders of November 4, 1974 grew out of a question arising under the estate tax law.

In arguing that position, the government, in our opinion, takes an unrealistically narrow view of language. While the Tax Court's 1974 determinations are for estate tax purposes, nevertheless, they are closely related to, or made respecting, an essential income tax consideration. The value as ultimately determined or redetermined for purposes of the federal estate tax necessarily constitutes the basis in any computation, for income tax purposes, of gain or loss.

As the focal point of its argument, the government points to the fact that, originally, the right to mitigation clearly was

limited to situations in which a change for income tax purposes in one context led to an understatement or overstatement of income taxes in another context. It contends that the determination defined in § 1313(a) as "a decision by the Tax Court" should be construed as though the definition read "a decision by the Tax Court under the income tax laws."

To justify such supplementation of the language as it actually appears in the statute, the government points to the predecessor of the present §§ 1311–14, that is to § 820 of the Revenue Act of 1938 (§ 3801 of the 1939 Internal Revenue Code). The earlier statute provided, with respect to the circumstances under which an adjustment would be made under the mitigation provisions, that they should be specifically limited to "a determination under the income tax laws." That is admittedly strong medicine, and, were we still in the period prior to 1954, the government would readily win.

However, there is a difficulty of gargantuan proportions. In the amendments adopted in 1953, which became the 1954 Code, Congress cut out the language from which the government seeks to derive comfort. To us, it seems that the deletion of language, having so distinct a meaning, almost compels the opposite result when words of such plain meaning are excised.[9]

---

must be determined the quantum of the claim, if an adjustment is appropriate under the mitigation statutes. The parties here have stipulated as to the amounts of the refunds due, if §§ 1311 1314 of the Internal Revenue Code of 1954 (26 U.S.C. §§ 1311–14) do apply ($40,-972.01 plus interest as provided by law for David's trust; $25,870.54 plus interest for Annie's estate).

The amount of the adjustment shall be the equivalent of a tax overpayment for the applicable taxable year:

as if on the date of the determination one year remained before the expiration of the periods of limitation upon assessment or filing claim for refund for such taxable year or years.

§ 1314(b).

The provisions of §§ 1311–1314 are by § 1314(e) expressly made inapplicable to employment taxes, which are covered in Subtitle C of the Internal Revenue Code of 1954 (26 U.S.C. §§ 3101 ff.).

**9.** The government seeks to minimize the reduction in the impact on its argument deriving from the deletion of that language by pointing out that location in the 1954 Code of the mitigation provisions was in a portion unambiguously devoted to matters of income tax law. Instead of being included among Miscellaneous Provisions, as it was in the 1939 Code, it was in Subtitle A, headed "Income Taxes"—Subchapter Q "Readjustment of Tax Between Years and Special Limitations."

However, the government's position overlooks the fact that what we are here concerned with are solely questions of income tax liability. We do not accept that a statutory provision, simply because it is within a portion of the statute devoted to income tax matters cannot refer or have been intended to refer, where it is obviously pertinent to do so, to other matters not income tax in nature, including estate and estate tax considerations. Such is particularly the case where the matters referred to are significant with respect to, and

See 2A C. Dallas Sands, *Sutherland Statutory Construction* § 51.02 (4th ed. 1973) ("[If] words used in a prior statute to express a certain meaning are omitted, it will be presumed that a change of meaning was intended."). *Cf. Adams v. Proctor & Gamble Mfg. Co.*, No. 81–1197, slip op. at 6–7 (4th Cir.).

The government also seeks to bolster its position by citing the Regulation under the 1954 Code and two cases which have followed it. 26 C.F.R. § 1.1311(a)–2(b) states that:

> Section 1311 may be applied to correct the effect of the error only as to the tax or taxes with respect to which the error was made which correspond to the tax or taxes with respect to which the determination relates. Thus, if the determination relates to a tax imposed by chapter 1 of the Internal Revenue Code of 1954, the adjustment may be only with respect to the tax imposed by such chapter or by the corresponding provisions of prior law.

■ The regulation, of course, must conform to the law as laid down in the statute. The deference due to a regulation does not extend to application of a law in a fashion contrary to its perceptible and perceived intent. *See United States v. Vogel Fertilizer Co.*, —— U.S. ——, ——, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). The regulation under the 1954 Code simply parrots the regulations earlier framed under § 820 of the 1938 Revenue Act,[10] and does not appear to have allowed any weight to the significant deletion of language previously appearing which restricted the mitigation provisions to situations where, when taxes for two different years were involved, if one was the income tax, the other had to be income tax too.

An uncritical acceptance of the Treasury Regulations, therefore, such as is found in *Evans Trust v. United States*, 462 F.2d 521, 524–25 (Ct.Cl.1972), does not lend substantial support to the government's position. The case has little precedential effect here in any event inasmuch as:

1) The court did not question the status of an estate tax decision as a "determination," but rather rested its conclusion on a failure to satisfy the provisions of § 1312(5). The decision on those latter grounds is fully defensible. We, however, have a case concerning whether a circumstance described in § 1312(7) is met, and, as we shall demonstrate *infra*, the Chertkof fiduciaries have satisfied the § 1312(7) requirements. The circumstance in § 1312(7) is "Basis of property after erroneous treatment of a prior transaction."

2) The Court of Claims did not have before it a situation in which a determination with respect to one tax which was in dispute had been made which was inconsistent with another. Instead, the situation was one in which the government fully accepted the taxpayer's valuations for estate tax purposes. As part of a settlement, the tax-

---

related closely to ascertainment of, income taxes. Indeed, the Code specifically is constructed in just such a fashion. Under the Income Tax subtitle appear:

1) § 1014 dealing with the basis of property acquired from a decedent ("the fair market value ... at the date of the decedent's death"). Compare the estate tax language in § 2031: "the value at the time of [the decedent's] death;"

2) § 1015 dealing with the basis of property acquired by gifts; and

3) § 641–692 dealing with income tax applications to estates, trusts, beneficiaries and income in respect of decedents.

It is just such a provision with which we concern ourselves here, for ascertainment of values under the estate tax law plays a determinative role in fixing an essential factor (ba-

sis) in the equation employed to ascertain the amount of income tax liability.

The practical identity of the estate tax valuations and the income tax basis determinations in a case of this sort is recognized by the government in this very case. At the time of the November, 1974 settlements of estate tax values, the government negotiated a contemporaneous collateral agreement establishing that the values so agreed upon would determine bases for income tax purposes in any subsequent income tax returns.

**10.** "With the exception of the updated reference to Subtitle A of the 1954 Code, the regulations under the 1954 Code are almost identical to that of the regulations under the 1939 Code." *Provident National Bank v. United States*, 507 F.Supp. 1197, 1201–02 (E.D.Pa.1981).

payer agreed to treat certain assets as though they belonged to another distinct taxpaying entity, as to which there was. no tax controversy pending at all. When the assets were so included, the second tax entity attempted not simply, as in the Chertkof case, to write up the values of assets by the amount of increases in a related proceeding. Instead, it claimed the right to classify and treat the assets as estate assets, and thereby to obtain certain advantages not otherwise available to it. The government could not have created an inconsistent position, because the assets placed, under the settlement agreement, into the estate were property which need not have been so placed at all. The issue, therefore, was not one of valuation, to which the mitigation statutes are especially addressed, but one of the includibility, *vel non*, of assets in the estate.

Similarly distinguishable is the case of *Provident National Bank v. United States*, 507 F.Supp. 1197 (E.D.Pa.1981), where valuations were never in question, the assets being shares of publicly traded corporations (Gulf Oil Corporation and IBM) for which worth at any particular time was easily established and not controversial. Again the question was as to inclusion in an estate *vel non*, not of whether inconsistent valuations for the same holdings on the same date, one for estate taxes, one for income taxes, qualified for equitable adjustment under the mitigation statutes.[11]

The opinion in *Provident* fails entirely to advert to the fact that § 3801(b) of the Internal Revenue Code of 1939 (§ 820 of the 1938 Revenue Act) reads: "CIRCUMSTANCES OF ADJUSTMENT.—When a determination *under the income tax laws*—" (Emphasis supplied), whereas § 1312 of the 1954 Code provides simply: "Circumstances of adjustment. The circumstances under which the adjustment provided in section 1311 is authorized are as follows:". Furthermore, the reliance placed in *Provi-*

*dent* (and by the government in the instant case) on legislative history for the 1939 Code language (*not* the language of the 1954 Code) does not compel the result for which the court in *Provident* sought, and the government seeks, support.

The *Provident* case relies on a Senate Finance Committee Report reference to the bill's provision of "an equitable solution of certain classes of *income tax problems.*" (Emphasis supplied in *Provident* opinion) and on a similar statement in the Conference Report speaking of the consequence of the bill as "mitigation of some of the inequities under the *income-tax* laws caused by the statute of limitations and other provisions which now prevent equitable adjustment of various *income-tax* hardships." (Emphasis supplied in *Provident* opinion).

However, it must be emphasized that we are here concerned with an income-tax problem. It arises under the income-tax laws. It concerns an income-tax hardship. On the government's view of things, unwarrantedly excessive *income tax* liabilities for the fiscal year 1971 will have been visited on the Chertkof fiduciaries. The quoted Finance Committee and Conference Reports do not speak of "exclusively" income-tax problems, laws or hardships. We deal with a problem which has two guises, both income tax and estate tax in nature. The problem is no less an income-tax problem because it is, in addition, an estate-tax problem.

Consequently, closely reasoned and thorough as the opinion of the district judge is in *Provident*, we are not persuaded to accept his conclusion that a Tax Court estate tax decision cannot be a § 1313 "determination." We note that we have the countervailing authority of an opinion by a district court judge in our own circuit who has held that the Tax Court estate tax decisions were "determinations" for § 1313 purposes.

---

11. In another context (the impact of the collateral agreement as to the basis values to be used thereafter for income tax computations of gains and losses), the court referred to the agreement as "a commitment relative to some matter other than the amount of the assess-

ment or overassessment involved but corollary to the case disposition." 507 F.Supp. at 1202. By contrast, in the present case, the two matters tie together directly, and not purely in a corollary way.

*Chertkof v. United States*, 81–1 U.S.T.C. ¶ 9326, at 86,853 (D.Md.1981):

> No existing statutory language enunciates the government's proposed limitation that each and every § 1312 circumstance of adjustment must relate to an *income* tax determination. . . .
>
> . . . .
>
> This analysis leads to the inexorable conclusion that the §§ 1311–1315 mitigation provisions are activated by a determination, meeting the definitional standards of § 1313(a), which is described by one or more of the circumstances of adjustment set forth at U.S.C. § 1312. Congress has expressly so chosen to limit the types of determination giving rise to mitigation relief, and this Court will not run roughshod over this manifest expression of intent in the manner suggested by the government. . . .

The Maryland district judge in the very case before us, therefore, was satisfied that the taxpayers had succeeded in showing compliance with the § 1313 "determination" requirement.

Nor, if the government's position is sound that two income tax liabilities, and nothing but two income tax liabilities, must develop the inconsistency for the mitigation provisions to apply, does it make sense for § 1314(e) even to appear. It would be redundant to include language making the mitigation provisions inapplicable "to any tax imposed by subtitle (C) (sec. 3101 and following relating to employment taxes)." The government weakly seeks to explain that contretemps away by arguing that there are in § 6521 special mitigation provisions applicable to employment taxes. But, precisely because there are no special mitigation provisions for estate taxes, the reasons are all the stronger for saying §§ 1311–1314 do apply when a prevailing inconsistent position as to estate taxes leads to an excessive imposition of income tax (or alternatively, for holding that the failure to exclude estate taxes in the way that employment taxes have been expressly excluded, is a positive reason for determining that §§ 1311–1314 are applicable to a case like the one now confronting us).

■ It is of some relevance that government counsel at argument conceded that she could advance no policy argument in favor of the narrow, exclusionary, approach proposed for interpreting the mitigation provisions. Instead the government rests its case on a claim of total clarity—complete unambiguity—of the language, regardless of whether the phraseology is consistent with the purposes it seeks to effectuate.[12] That is, however, a bold assertion for any provision of the often convoluted and generally highly technical language of the Internal Revenue Code. Ambiguity is almost by definition present whenever an arcane, bureaucratic guide to an amalgam of economics, revenues and political policies must be reconciled with the day to day facts of everyday life. Obviously, the objectives which a tax statute was designed to achieve are a prime consideration in determining what its language intended to convey. *See United States v. Vogel Fertilizer Co.*, —— U.S. ——, ——, 102 S.Ct. 821, 831, 70 L.Ed.2d 792 (1981) ("[I]t is Congress' understanding of what it was enacting that ultimately controls.").

The situation in which the taxpayers here find themselves appears to provide a classic example of the sort of nonculpable trap into which one is all too likely to fall where the inevitable time-consuming process characteristic of tax collections, whenever there is disagreement as to liability, valuation or amount, causes the limitations period for claiming a refund of one tax obligation to expire prior to the date on which a determination takes place with respect to another tax liability. It is only when the latter determination is fixed that, for the first time, a need arises to revise the computation of the tax on which limitations for a refund claim (or for a claim for additional taxes should the determination have favored the taxpayer) has expired.

---

12. In the government's brief at page 40 there appears the following: "In sum, the relief sought by the taxpayers here may appear to be equitable, but it has not been provided for by Congress."

The objectives of the mitigation statutes will have been served in the present case, and there will have been no contradiction of the policies underlying statutes of limitation by allowing the refunds sought.

The contrast between the present case and the usual posture in which statutes of limitation apply reveals why denial of the mitigation provisions of the statute would be extremely unjust. While, theoretically, no doubt Congress may enact, and, from the point of view of some taxpayers at least, has, on occasion enacted laws which have led to unfair fiscal impositions,[13] it is not lightly to be imputed that Congress intended to do so.[14] On the contrary, it is much more reasonable and probable to assume that Congress intended to be just. The whole thrust of the mitigation statutes is in that direction.

The normal statute of limitations situation is one where a potential plaintiff is unhampered and unhindered in bringing a cause of action, yet allows so long a time to go by without acting that the probabilities become strong that unfairness to his potential opponent will develop either through disappearance of evidence, weakening of memory, death or departure of witnesses, or change of position. One must, after expiration of a fixed period, be able to know that a matter is over and done with.

In the present case, however, there was, from the time the income tax returns were filed until the determinations by the Tax Court in 1974 no legitimate basis for the Annie Chertkof estate or the David Chert-kof trust to initiate and pursue any claim for income tax refund. They did not know whether, indeed, they had a claim or, if they did, how much it amounted to. In a real sense the refund claim only matured on November 4, 1974. It, therefore, was eminently reasonable to allow the modest additional period of one year under the mitigation statutes to apply. Since the purpose of the flat three year statute of limitations would not be furthered by its application to the Chertkof entities here, we should be slow to frustrate perfectly valid refund claims solely on limitations grounds.

The government's reaction is that the Chertkof fiduciaries could have avoided the kind of a problem that now confronts them simply by filing protective income tax refund claims as soon as the government first contended (November 14, 1972 for David's trust, November 8, 1973 for Annie's estate) that there should be an upward revision in the values for federal estate tax purposes (and, correspondingly, by implication, higher bases for income tax purposes). However, that argument would virtually emasculate the mitigation provisions because in many, if not all, circumstances hypercautious taxpayers would be able to file protective claims against other possible, but as yet unascertainable, tax liabilities. To us it seems that Congress had in mind the elimination of such essentially unnecessary and obtrusive paperwork, which inevitably would divert taxpayers and their counsel from more productive labor, and provoke a distaste for government out of all proportion to the corresponding benefits, if any.[15]

---

**13.** *See* J. M. Maguire, S. S. Surrey and R. J. Traynor, *Section 820 of the Revenue Act of 1938*, 48 Yale L.J. 509, 515:

. The world at large, and the income-tax world in particular, are full of hardship and loss despite which it is deemed sound policy to enforce general rules inflexibly.

**14.** *See, e.g., Holy Trinity Church v. United States*, 143 U.S. 457, 461, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892); *McNair v. C. I. R.*, 250 F.2d 147, 150 (4th Cir. 1957).

**15.** It may not weigh heavily in the balance, given the assiduousness of most tax practitioners and the general absence of high matters of principle in the eminently practical area of tax-es, but it does appear reasonable for Congress to have recognized that one should not needlessly be placed in the position of an excessively diligent player of games, prematurely asserting a claim one does not believe to be well-founded and for which the hope is that it will be lost. *Cf. Chertkof v. C. I. R.*, 649 F.2d 264, 267 (4th Cir. 1981):

The basic purpose of the mitigation provisions is to permit the correction of an earlier decision which is determined to be erroneous in a subsequent administrative or judicial action; the intent is that the correct tax be paid or the correct deductions be allowed, not that a windfall be provided to either the taxpayer or the government on a gamesmanship theory of "fault."

Congress has explicitly recognized the problem:

> Legislation has long been needed to supplement the equitable principles applied by the courts and to check the growing volume of litigation by taking the profit out of inconsistency, whether exhibited by taxpayers or revenue officials and whether fortuitous or the result of design.

S.Rep.No.1567, 75th Cong., 3d Sess. 49–50 (1938), cited approvingly in *Chertkof v. C. I. R.*, 649 F.2d 264, 268 (4th Cir. 1981).

■ The next line which the government has sought to persuade us to follow derives from the language in 26 U.S.C. § 1312(7)(A) requiring that there be a "transaction on which such basis depends," not a transaction dependent upon the basis. As the district judge has correctly pointed out, the sales or other dispositions triggering recognition of gain for income tax purposes in fiscal year 1971, while evidently transactions, could not meet the statutory requirement because they would be transactions which depend on basis, not transactions on which basis depends.

However, the Chertkof fiduciaries make no such contention respecting events in 1971, and have accepted that the occurrences of 1968, in the case of David's trust, and of 1969, in the case of Annie's estate, must be studied to see if there were, in those years, activities which respectively constituted a "transaction," as the term is employed in the statute. The district court came to a conclusion that there were not any such transactions in 1968 and 1969, because "death is not a transaction as that term is used in this particular statutory provision." The same contention is pressed before us by the government.

The argument runs that, as distinguished from the situation where there is a deed, a bill of sale, or other palpable document of intervivos transfer, only the transcendental event of death occasions change of ownership when a decedent dies, death is all that occurs, and death is not a *transaction* upon which basis depends. That amounts, however, to no more than a rather implausible play on words. It is manifestly far more accurate to recognize that it is not simply to death which the taxpayers turn to satisfy the statutory requirement of 26 U.S.C. § 1312(7)(A). With the death also comes a transfer of title. That transfer must be regularized by the preparation of papers almost as inevitable and essentially as formal as an intervivos instrument such as a bill of sale. For real estate, title may automatically vest in the heirs [16] but, far more commonly, the will (which as a practical matter must be probated) has designated, as transferees, devisees or the personal representatives. For securities, the type of assets here involved, on death ownership vests in legatees or the personal representatives.[17] Accordingly, there is as much a transfer—a transaction—following the owner's death as when title passes by deed. The same consequences flow, namely disposition by one person (the decedent) and acquisition by another person or persons (heir, devisee, legatee, personal representative, remainderman or trustee).[18]

---

**16.** In which case, not the death alone, but death *and* the application of the rules of intestate law defining who are heirs and providing for devolution of realty to them constitute the transaction.

**17.** Or, under David's trust in the remaindermen or the trustees, who succeed to ownership by virtue of application of pertinent provisions of trust law.

**18.** In support of the existence of a transaction on which basis depends, the Chertkof fiduciaries cite the general language of 26 U.S.C. § 1014, which concerns the basis of "property acquired from a decedent." On that they superimpose the dictum in *Gardiner v. United States*, 536 F.2d 903, 907 (10th Cir. 1976) that a transaction encompasses, for § 1312(7) purposes, "distributions, sales, purchases, dispositions, *acquisitions*, . . . exchanges, . . . or transfer[s]." (Emphasis supplied). *Gardiner* held, however, that the events claimed by the taxpayer to be a transaction amounted to none of those things.

Those authorities do not address in any specific way the question. While the verbal logic construct happens to reach the right result, it standing alone would not be particularly persuasive.

The transactions, consequently, also were ones on which basis depends. For purposes of the estate tax, the valuation figure assigned to the events of transfer and acquisition is the market value at the date of death. That, of course, is comparable to the price paid, which is a reasonable choice for fixing fair market value in the case of an intervivos transaction such as a deed or a bill of sale. Since the market value as of the time of death becomes the basis, inescapably the transaction of mutation of ownership is one on which basis depends.

It is true, of course, that the same figure is used both to calculate estate taxes, and to put the government and the taxpayer in a position to compute income taxes once a future gain or loss is recognized. But the duality makes it no less true that, looking at the transaction for *income tax* purposes only, it is one on which the basis depends. If on the day on which death in fact occurred there had been no death, with the associated transfers which then took place, and, hence, no devolution of the property on that date, a different basis for income tax purposes would have to be determined.

■■ Thus, the decision of the district judge must be reversed for, on the questions addressed by him, the taxpayers are entitled to prevail. However, there remain unanswered two questions not reached by the district court because the answer adverse to the taxpayers on the question of whether the transaction was one on which the basis depended rendered them irrelevant. Those questions are:

A. Whether, under § 1311(b)(1), there has been adopted by the Secretary or his delegate in the determination a position inconsistent with the erroneous inclusion, the Secretary being the party against whom the mitigation provisions are being invoked.

B. Whether the requirements of § 1312(7)(B) are met as to status for the Chertkof fiduciaries. Are they taxpayers with respect to whom erroneous treatment occurred and taxpayers with respect to whom the determinations were made? [19]

Normally, it would be necessary to vacate and remand with instructions that the district court consider and resolve those unanswered questions. However, in the particular circumstances of the present case, easily determined and unambiguous answers present themselves for both taxpaying entities as to one of the questions, and for one of the taxpayers with respect to the other. For Annie Chertkof's estate, we are satisfied that it should prevail entirely on the claim for a refund. As for David Chertkof's trust, however, the matter not having been fully addressed by the parties, and no certainly correct answer appearing on the surface of things, we remand for further consideration in light of this opinion.

There can be no question about the existence of an inconsistent position taken by the Secretary of the Treasury for either Annie Chertkof's estate or David Chertkof's trust. We are not impressed with the government's claim that it never took a position in the determination, i.e. the ascertainment of values for estate tax purposes, which was inconsistent. It, the argument runs, consistently advocated the higher figures ultimately established by the November, 1974 Tax Court decisions. However, that approach again steadfastly ignores the nature of the estate tax valuations and the income tax basis determinations as virtual Siamese twins. The collateral agreements [20] insisted upon by the IRS provided, in connection with the estate tax determinations, "for certain agreed income

---

**19.** There is theoretically still another question, namely, whether, under § 1312(7)(C), there was a prior erroneous treatment through erroneous recognition, or nonrecognition, of gain or loss. However, it is patently the case that in 1971 there was an erroneous recognition of gain (or loss). Unquestionably that occurred prior to November, 1974.

**20.** Interestingly the standardized forms employed bore the heading: "Collateral Agreement—Estate Tax." The form language re "As part of the consideration for the acceptance by or on behalf of the Commissioner of Internal Revenue of a proposal for settlement of this estate's total Federal estate tax liability on the basis of the amount shown above, I agree that my property basis for income tax purposes will be as follows:".

tax bases" which were the identical amounts contained in the negotiated settlements of the estate tax valuations.

Realistically, the acceptance [21] by the IRS, prior to the November, 1974 estate tax settlements, of lower figures for purposes of establishing for fiscal year 1971 the amounts of income tax gains and losses was the adoption of a position inconsistent with what ultimately prevailed (i.e., was determined) for estate tax purposes (and for income taxes as well). It was erroneous in that it led to the erroneous recognition of gain (and nonrecognition of a loss), and involved a transaction prior in time to November, 1974. The inconsistency, therefore, created a circumstance affecting the basis of property after erroneous treatment of a prior transaction. 26 U.S.C. § 1312(7).

When, in the end, the government succeeded in obtaining upward revision of but one of two altogether interdependent positions, it inescapably placed the government in an inconsistent position, thereby satisfying 26 U.S.C. § 1311(b)(1), unless it accepted upward revision of the other as well. If it had accepted upward revision of the other as well, while § 1311(b)(1) may not then have been satisfied, the Chertkof fiduciaries would have gotten their refunds, and we would have been spared the necessity for deciding a tortuous case.

The conclusion that there has been an inconsistent position for the purposes of 26 U.S.C. §§ 1311–1314 is reinforced by our recent decision in *Chertkof v. C. I. R.*, 649 F.2d 264 (4th Cir. 1981). There the taxpayers contended that limitations barred the Commissioner from recovering a deficiency originally asserted for the year 1965, but established in prior litigation actually to relate to the 1966 tax year. The deficiency asserted that there had been an erroneous treatment of a transaction which generated ordinary income as a transaction resulting in capital gain. The Court stated taxpayers' position as follows:

Taxpayers' first contention is that, since it was the Commissioner and not they who erroneously determined the tax was due in 1965, and since their position has never been inconsistent with the conclusion reached in *Perma-Rock [Products, Inc. v. United States*, 373 F.Supp. 159 (D.Md.1973)] that 1966 was the proper tax year, the mitigation provisions do not apply and the deficiency assessed in 1974 for the taxable year 1966 is barred by the statute of limitations. Taxpayers correctly assert that the deficiency assessment for 1966 would have been time-barred after April 15, 1970, unless kept alive by the mitigation provisions of 26 U.S.C. §§ 1311–1314. We agree with the Tax Court, however, that the mitigation provisions do apply and, therefore, that the Commissioner's action is not barred by the normal statute of limitations.

649 F.2d at 266. We went on to say:

Likewise, there is no requirement that the party who benefits from the application of the statute of limitations must have maintained a position inconsistent with that which it initially advanced. It is only necessary that the position adopted in the determination be inconsistent with the exclusion or deduction in another year.

. . . .

Case law also supports the Commissioner's position that the mitigation provisions can apply regardless of who erroneously excluded the taxable item and who took inconsistent positions. . . .

649 F.2d at 267–268.

Finally, we address the question of whether the taxpayers have satisfied the statutory requirements of 26 U.S.C. § 1312(7)(B). For Annie Chertkof's estate the answer is simple and affirmative. It was the income taxpayer with respect to whom the erroneous treatment occurred. It was also the taxpayer "with respect to

---

**21.** At page 11 of its brief, the government puts things in the proper perspective: "Taxpayers used too low a value for estate tax purposes, *and thus* too low a basis for income tax purposes, *which the Commissioner originally* ac-

cepted." (Emphasis supplied.) Consequently, by its acceptance, the IRS inevitably "used too low a basis for income tax purposes, *and thus too low a value for estate tax purposes.*"

whom the [1974] determination [was] made" which affected both estate tax and income tax computations.

For David Chertkof's trust, things are not quite so simple. The erroneous income tax treatment occurred with respect to it. But David Chertkof's estate was responsible for the increase in estate tax liability. We are uncomfortable about deciding whether the David Chertkof trust was the taxpayer with respect to whom the 1974 determination was made without sorting out the relevance of numerous possible considerations. The assistance which briefing and argument by counsel would supply is necessary. Among possible considerations:

1) Did inclusion of the values for the shares of stock owned by the David Chertkof trust in the David Chertkof Estate for federal estate tax purposes, because of the provisions of 26 U.S.C. § 2036, constitute the David Chertkof trust the taxpayer with respect to whom the determination was made?

2) Was David Chertkof's trust, by reason of Maryland law as to apportionment of estate tax liability, responsible for the increase in that tax? If so, would that lead to substitution of David Chertkof's trust for the David Chertkof estate as the taxpayer with respect to whom the determination was made?

3) What is the applicability or significance of the definition of "related taxpayer" in 26 U.S.C. § 1313(c), especially the inclusion of "grantor and fiduciary" and "grantor and beneficiary?"

We accordingly reverse and remand with instructions to enter judgment awarding an income tax refund to the executors of the Annie Chertkof estate computed using, as the basis of each of the securities involved, the values reassigned by the orders of the Tax Court dated November 1, 1974. With respect to the refund claim of David Chertkof's trust, we vacate and remand for further proceedings not inconsistent with this opinion.

REVERSED IN PART AND VACATED AND REMANDED IN PART.